UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CR. NO. 25-CR-248 (CJN) |
| JAMES JACKSON | ) | |
| | ) | |

## MEMORANDUM IN AID OF SENTENCING

*"Over the years, I have come to know James as a man of deep compassion, humility, and integrity - one who has dedicated his life to helping others find hope and restoration."*

Pastor Jerome Mills

The start of James Jackson's life was far from the idyllic Normal Rockwell paintings of the 1950s. Born into a forbidden union in the late 1960s between two teenagers from opposite sides of the tracks in rural Virginia, the odds were stacked against him. After his birth, his mother, a poor teenage girl who had been abused all her life, knew nothing better than to connect with a man named ███████ ████████████████████████████ ████████████████████████████████████████ Led to believe that this man was his father, young James followed everything Hill told him to do. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
away, James's young mind could not comprehend what was happening. When James was seven, he learned that Curtis Barrett, ██████, was his biological father.

████████████████████████████████████████. He suffered at the hands of his mother as well. His mother would use corporal punishment to discipline him. She used extension cords and often her beatings were so vicious that it would leave visible marks on his body.

When James's younger brother Chris was born, his mother wanted her freedom again, so she dropped James and his younger brother in foster care, as if it were a baby-sitting service. In 1977, at age 10, his mother placed him

2

in a foster home with all female residents, which included a foster mother whom he described as "horrific." ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ James ran away from the foster home and told the police that he couldn't find his grandmother who was in Richmond, VA. D.C. Social Services placed him on a bus to Richmond, and he stayed with his grandmother. But soon, his mother found him and brought him back to D.C.

Two years later, when he was 12 years old, his mother dropped him off at a group home. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. He reported the incident and there was an internal investigation resulting in the re-arrangement of staff. Older teenagers who found out what happened showed 12-year-old James how to get to the bus station and once again, he was able to escape the nightmare. And once again, his mother found him in Richmond and brought him back to D.C.

When Curtis tried to step in to be a father, his mother presented every obstacle, including near deadly ones. When James stayed at his father's place to escape his mother's abuse, his mother would call the police to find him. Once, she drove by Curtis's place with male associates and shot up Curtis's windows to send a message that she had control over James. As a result, James was back in his mother's prison.

It is no surprise that James would eventually be caught up in the

criminal justice system himself. "'The 1980s were a decade of deterioration for children[]'" because in part "[c]hild poverty worsened[,]" and "[j]uvenile incarceration soared."[i]

James Jackson has struggled to put his past behind him. After being released from prison in 2019, he obtained a job and lived with family members and loved ones. His only arrests have been in connection with living and working in the D.C., Maryland, and Virginia area and trying to comply with the various registration requirements. The matters were dismissed because the records showed that he sent in his registration paperwork. His failure to register in this case was not due to his attempt to flee or evade detection.

He still suffers from post-traumatic stress disorder and anxiety being in enclosed spaces and had to endure that trauma after being arrested in this case. While he was released, the failure to register triggered cases in the Maryland court (where he was registered to live), the Virginia court (where he was registered to work), and D.C. Superior Court (which held him for the Maryland and Virginia cases). Mr. Jackson spent several weeks in jail waiting to be transported from one jurisdiction to another.

Mr. Jackson is more than his criminal history and struggles. As his pastor stated, "Over the years, I have come to know James as a man of deep compassion, humility, and integrity - one who has dedicated his life to helping others find hope and restoration."[ii] He has struggled to maintain employment which is not an easy

feat for anyone required to register as a sex offender.

> Registered sex offenders (RSOs) experience extreme stigmatization and monitoring even after they are released from incarceration. This is due, in part, to sex offender registries which perpetuate high levels of stigma and can contribute to false narratives about reoffending, victimization, and the homogeneity of sex offenders. As a result of societal level stigma, RSOs often struggle to locate and maintain employment, secure suitable housing, and establish positive, prosocial relationships.[iii]

Despite these stigmas, Mr. Jackson maintained employment, and recently obtained a new position.

Mr. Jackson is aware that his criminal history is not comforting. His history reflects a troubled upbringing and mental health issues. Based on the nature and circumstances of the offense, Mr. Jackson's background, his acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of time-served, which is fair and reasonable.

## **Sentencing Law**

The Supreme Court in *United States v. Booker* declared that the Federal Sentencing Reform Act of 1984 made the federal sentencing guidelines "*advisory*," not binding on federal courts. *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added). Under *Booker*, the district courts only need to "consult th[e] Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). Courts must consider all of the factors set forth in 18 U.S.C. § 3553(a):

> (1) the nature and circumstances of the offense and the history and

5

    characteristics of the defendant;

    (2) the need for the sentence imposed—

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established for—

        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …

    (5) any pertinent policy statement— …

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

The Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United*

*States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

> Congress has further provided that:
>
> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id.* § 3553(a) (emphasis added).

## Argument

For the following reasons, a sentence of time-served is the only sentence that is not greater than necessary, yet sufficient, for the purposes of sentencing.

### I.     The Nature and Circumstances of the Offense

The Statement of Offense addresses the conduct which led to the indictment in this case. In short, Mr. Jackson was living with his girlfriend in D.C., bouncing back and forth between his brother's residence in Maryland, where he was

7

registered and his girlfriend's place between the dates of June 9, 2025, and August 25, 2025. This is not an offense that involved violence.

## II. Mr. Jackson's History and Characteristics

As detailed above, James Jackson was constantly and viciously abused as a young child. The sexual, emotional, and physical abuse continued into his teenage years. Growing up in violence can have a long-lasting impact. The U.S. Department of Health and Human Service's Office on Women's Health explained that "[c]hildren who witness domestic violence or are victims of abuse themselves are at serious risk for long-term physical and mental health problems."[1]

"[T]he impact of violence extends well beyond physical injury and patterns of behavior as it comes to occupy the minds of those living in violence-ridden contexts where thought processes are often governed by a focus on survival and constant vigilance."[2] The impact of growing up in violence also has serious effects on young adults, who "experience crime at twice the rate of any other age group."[3] In addition, "[y]oung adults of color are disproportionately impacted by the way the justice system currently approaches their behavior: among a sampling of eight cities and counties, young adults were found to be 8.4 percent of the population, but were

---

[1] U.S. Dep't of Health and Human Services Office on Women's Health, *Effects of Domestic Violence on Children*, https://www.womenshealth.gov/relationships-and-safety/domestic-violence/effects-domestic-violence-children, (last accessed on Jan. 3, 2022).
[2] Bianca E. Bersani *et al.*, *Thinking About Emerging Adults & Violent Crime*, eajustice.org, 6 (May 2019).
[3] Justice Policy Institute, *Improving Approaches to Serving Young Adults in the Justice System*, Dec. 2016, p. 1.

8

25 percent of the people in jail."[4]

Exposure to violence impacts one's educational advancement. "[A]nxiety levels rise and cognitive functioning worsens among school children following a violent crime within half a mile of their home."[5] "Research measuring the direct impact of exposure to violent events (i.e., local homicide) on academic performance estimates that the effect on cognition is pronounced with reading and language skills regressed roughly two years, lessening impulse control and the ability to maintain attention."[6]  Furthermore, "[i]ndividuals who witness violence are also at increased risk for a variety of mental health issues, which can manifest as post-traumatic stress disorder, depression, poor academic performance, substance abuse, … these costs weigh largely on the shoulders of black Americans."[7]

"Psychological research also shows that living in poverty is associated with differences in structural and functional brain development in children and adolescents in areas related to cognitive processes that are critical for learning, communication, and academic achievement, including social emotional processing, memory, language, and executive functioning."[8]  Despite his challenges, Mr.

---

[4] *Id.*
[5] Richard V. Reeves and Sarah E. Holmes, *Guns and race: The different worlds of black and white Americans*, Brookings, Dec. 15, 2015, available at https://www.brookings.edu/articles/guns-and-race-the-different-worlds-of-black-and-white americans/  (last accessed Jan. 7, 2024).
[6] Bianca E. Bersani et al., Thinking About Emerging Adults & Violent Crime, eajustice.org, 6 (May 2019).
[7] Reeves, et al., Brookins, supra note 33.
[8] American Psychological Association, *Mental health effects of poverty, hunger, and homelessness on children and teens*, last updated May 2024, available at

Jackson was able to obtain his GED, with his highest scores in science and social studies. In addition, he obtained an associate's degree and held a good scholastic standing. (Final PSR ¶ 81). He is currently enrolled in Colorado Technical University and has a 3.00 GPA.[9]

Finding solid employment after years of incarceration is extremely difficult, even after attending classes and obtaining a GED. According to the Prison Policy Initiative, approximately 60% of formerly incarcerated individuals were jobless in 2022 based on a report released by the Bureau of Justice Statistics (BJS).[10] Notably,

> The report shows that of more than 50,000 people released from federal prisons in 2010, a staggering 33% found no employment at all over four years post-release, and at any given time, no more than 40% of the cohort was employed. People who did find jobs struggled, too: Formerly incarcerated people in the sample had an average of 3.4 jobs throughout the four-year study period, suggesting that they were landing jobs that didn't offer security or upward mobility.[11]

The article further explains that "**[f]ormerly incarcerated individuals tend to experience joblessness and poverty that started long before they were ever locked up.**"[12]

> When they're released from prison, the pressure is on to get a job: People on parole (or "supervised release") often must maintain

---

https://www.apa.org/topics/socioeconomic-status/poverty-hunger-homelessness-children

[9] Colorado Technical University course work and GPA (Exhibit 2).

[10] Leah Wang and Wanda Bertram, *New data on formerly incarcerated people's employment reveal labor market injustices*, Prison Policy Initiative, Feb. 8, 2022, available at https://www.prisonpolicy.org/blog/2022/02/08/employment/ (last accessed on March 8, 2023).

[11] Id.

[12] Id. (emphasis added).

10

employment or face reincarceration, while struggling to access social services, and trying to make ends meet in a job market more hostile to them than ever before. This combination of pressures amounts to a perpetual punishment.[13]

While Mr. Jackson has been able to obtain employment, a steady, lengthy career has not been easy to obtain. He lost his previous job as an Amazon dispatcher as a result of his arrest and detention in this case and in Maryland, Virginia, and D.C. Of course, the racial disparity in employment cannot be ignored:

> Earnings were lowest for Black and Native American people released from federal prison; in fact, racial and ethnic disparities in earnings seemed to grow over time. These findings probably reflect an unfortunate "racialized re-entry" process for people leaving prison, where the stigma of incarceration itself and differences in social networks for job-seekers vary across racial and ethnic groups. Researchers of this concept noted that white people getting out of prison actually appeared more disadvantaged and less employable "on paper" due to higher rates of substance use and longer sentences, but still ended up with better employment and income than Black and Hispanic people leaving prison.[14]

Employment is further complicated by registered sex offender status. "[T]he employment process can be an arduous journey for sex offenders returning to the community that results in them frequently being under- and unemployed."[15] "When applying to these new employment prospects, offenders often experience shame, nervousness, and embarrassment about disclosing their offense to potential employers believing that they will be devalued and/or discriminated against as a

---

[13] Id.
[14] Id.
[15] Friedman, Emily N., *Reentry for registered sex offenders: Navigating stigma post-release* (2023). UNF Graduate Theses and Dissertations. 1226, available at https://digitalcommons.unf.edu/cgi/viewcontent.cgi?article=2295&context=etd

result."[16]

Mr. Jackson's history shows devastating mental health struggles from childhood to adulthood. Notably, incarceration can worsen mental health. "Prisons and jails are extremely violent places. People often experience traumatic verbal or physical assaults and dehumanization at the hands of correctional officers. And the various stressors in a carceral environment also increase the chances of violence between incarcerated people."[17] Furthermore, "[e]xposure to violence in prisons and jails can exacerbate existing mental health disorders or even lead to the development of post-traumatic stress symptoms like anxiety, depression, avoidance, hypersensitivity, hypervigilance, suicidality, flashbacks, and difficulty with emotional regulation." This is especially true for Mr. Jackson. (Final PSR ¶ 73).

Bryan Stevenson said in Just Mercy: A Story of Justice and Redemption, "**[e]ach of us is more than the worse thing we've ever done**." Mr. Jackson is more than his past. His supporter, Mr. Barlow, writes

> James has volunteered with Crossroads as a guest speaker and contributor, offering his time and wisdom to those seeking guidance and hope. He also dedicates himself to feeding the homeless at Hechinger Mall every third Saturday of the month, a commitment that reflects his hands-on approach to ministry and service.
>
> James is a "roll-up-your-sleeves" kind of minister—someone who doesn't shy away from the hard work of meeting people where they are. Whether in person or over the phone, he consistently ministers to those in need, offering resources, encouragement, and a pathway to recovery and a better life.[18]

---

[16] Id. at 11.
[17] Katie Rose Quandt and Alexi Jones, *Research Roundup: Incarceration can cause lasting damage to mental health*, Prison Policy Initiative, May 13, 2021, available at https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/.
[18] Letter by Dale Barlow (Exhibit 3); see also Letter by Maurice Stafford (Exhibit 4).

In addition, his pastor writes

> At our church, James has served as a speaker, peer counselor, and teacher in our Bridge Ministry meetings, where he has demonstrated both strong leadership and genuine care for those in recovery from addiction and life-controlling challenges. His insight and empathy have been instrumental in guiding many individuals towards stability, faith, and healthier life choices.[19]

## III. The Purpose of Sentencing Will be Accomplished with the Requested Sentence.

The Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553 (a).

### A. The Requested Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A lengthy term of incarceration is not required in order for a sentence to reflect the seriousness of the offense. Even a sentence of probation "rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."[20]

---

[19] Exhibit 1.
[20] *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing Gall, 552 U.S. at 99).

13

### B. The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.

Under 18 U.S.C. §§ 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant."

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect."[21] With respect to specific deterrence, research shows conclusively that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."[22] In addition, United States Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety."[23] This is consistent with a "body of research demonstrat[ing] that longer sentences do not reduce recidivism more than shorter sentences."[24]

---

[21] Five Things About Deterrence, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).
[22] *Id.* (emphasis in original); *see also* James Austin et al., *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").
[23] *Transforming Prisons, Restoring Lives*, Andre Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016).
[24] Austin, Brennan Ctr., supra, at 16.

Here, Mr. Jackson's failure to register has already been deterred because of the collateral consequences of failing to register. It resulted in him being arrested and detained three additional times in D.C., Maryland, and Virginia. Aside from this failure, Mr. Jackson has incurred no new offenses since his release from prison approximately 7 years ago.

### C. The Requested Sentence Would Provide Mr. Jackson with the Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner.

Under 18 U.S.C. § 3553(a)(2)(D) this Court must also consider "the need for the sentence imposed—. . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." However, 18 U.S.C. § 3582(a) explicitly states that "imprisonment is not an appropriate means of promoting correction and rehabilitation." Mr. Jackson does not need to be detained in this case in order to obtain the mental health treatment that he needs. In addition, detaining him would deter the progress he has made since his pre-trial release in this case.

### IV. The Requested Sentence Properly Reflects § 3553(a) Considerations.

When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). As stated above, courts should resist anchoring a sentence to the guideline numbers. *See Docampo*, 573 F.3d at 1105 n.5 (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a

15

considerable anchoring effect on a district court's analysis"). The defense requests a variance for the reasons stated above.

Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita*, 551 U.S. at 348, 350. This Court may not presume that a Guideline sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless." *Id.* at 351. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). "**It is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.**" *United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

V. **The Requested Sentence Would Not Create an Unwarranted Sentencing Disparity.**

Unlike other offenses, there are not many failure to register cases in this District. In *United States v. Andre McGant*, No. 12-cr-100-RWR, the defendant received a sentence of five months incarceration for failure to register. ECF No. 16. There, unlike here, the defendant submitted a number of false documents reflecting various addresses and knowingly provided false information to the D.C. Sex

16

Offender Registry officials at the D.C. Court Services and Offender Supervision Agency. ECF No. 7. Here, there is no allegation that Mr. Jackson submitted false information about his address.

In *United States v. Bobby M. Moore,* No. 13-cr-286-RMC, the defendant received a sentence of 18 months for failure to register. ECF No. 23. There, after being released from prison, the defendant did not register his address in Maryland or D.C. and had "stopped contact with parole staff and would not return messages left for him." ECF No. 14 at 3 and 5. There are no such allegation for Mr. Jackson. To the contrary, his supervision history shows full compliance on probation. (Final PSR at p. 15).

Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." 552 U.S. at 44 (citation omitted) (quoting district court). As a result, Mr. Jackson requests a sentence of time-served. The requested sentence is not greater than necessary and is sufficient for the purposes of sentencing.

## Conclusion

For the foregoing reasons, and for any other reasons set forth at the sentencing hearing, a sentence of time-served sufficiently addresses Mr. Jackson's conduct as well as other factors pursuant to 18 U.S.C. § 3553(a).

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

---

[i] Desert News, *'80s Were Poverty-Stricken and Violent Years for Kids, Study Finds*, Feb. 1, 1991, available at https://www.deseret.com/1991/2/1/18903617/80s-were-poverty-stricken-and-violent-years-for-kids-study-finds/

[ii] Letter by Pastor Jerome Mills (Exhibit 1).

[iii] Friedman, Emily N., *Reentry for registered sex offenders: Navigating stigma post-release* (2023). UNF Graduate Theses and Dissertations. 1226, available at https://digitalcommons.unf.edu/cgi/viewcontent.cgi?article=2295&context=etd